1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10  PRIME START LTD., a British Virgin Islands
corporation,

11              Plaintiff,                      CASE NO. C05-1195C

12      v.                                       ORDER

13  MAHER FOREST PRODUCTS LTD., a
Washington corporation; PACIFIC LUMBER
14  INSPECTION BUREAU, a Washington
corporation,
15
Defendants;
16
MAHER FOREST PRODUCTS LTD., a
17  Washington corporation,

18              Counterclaimant,

19      v.

20  PRIME START LTD., a British Virgin Islands
corporation,
21
Counterdefendant.
22

23          This matter comes before the Court on Defendants' Motion for Summary Judgment (Dkt. No.

24  13), Plaintiff's Opposition thereto (Dkt. No. 20), Defendants' Reply (Dkt. No. 25), and Plaintiff's

25  Surreply (Dkt. No. 35).  The Court has considered all of the papers submitted regarding this motion and

26  ORDER – 1

1   determined that oral argument is not necessary.  The Court hereby DENIES the motion and rules as

2   follows.

3   **I.      BACKGROUND**

4           This case is a contract dispute involving an approximately-$1-million purchase of Western Red

5   Cedar siding for use at a construction site in Moscow, Russia.  Plaintiff Prime Start, Ltd. is a British

6   Virgin Islands corporation that supplies construction materials to clients around the world.  Plaintiff

7   entered into a contract with Defendant Maher Forest Products, Ltd. ("Maher"), a Washington

8   corporation, for custom-manufactured wood products to be used by Plaintiff's client in Russia.

9   Defendant Pacific Lumber Inspection Bureau ("PLIB") is a Washington corporation that contracted with

10  Plaintiff to provide services related to quality control of the goods supplied by Defendant Maher.

11          Plaintiff's complaint alleges that both Defendants Maher and PLIB breached their contracts with

12  Plaintiff.  Defendant Maher allegedly supplied nonconforming goods, while Defendant PLIB allegedly

13  failed to inspect the goods according to the terms of the parties' agreement, thus allowing delivery of

14  nonconforming goods to the job site in Russia.  Defendant Maher has asserted counterclaims against

15  Plaintiff for costs incurred as a result of Plaintiff's alleged breach of the contract between Maher and

16  Plaintiff.  The instant motion is made jointly by both Defendants and seeks dismissal of all of Plaintiff's

17  claims.  Defendant Maher's counterclaims are not at issue.

18          Due to the lengthy contract negotiations involved here, the Court will incorporate discussion of

19  the relevant facts into its analysis of the legal merits of this motion.

20  **II.     ANALYSIS**

21          **A.      LEGAL STANDARD**

22          Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and

23  provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings,

24  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

25  that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as

26  ORDER – 2

1    a matter of law." FED. R. CIV. P. 56(c).  In determining whether an issue of fact exists, the Court must

2    view all evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in

3    that party's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Bagdadi v. Nazar*, 84

4    F.3d 1194, 1197 (9th Cir. 1996).  A genuine issue of material fact exists where there is sufficient evidence

5    for a reasonable factfinder to find for the nonmoving party.  *Anderson*, 477 U.S. at 248.  The inquiry is

6    "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

7    so one-sided that one party must prevail as a matter of law."  *Id.* at 251–52.  The moving party bears the

8    burden of showing that there is no evidence which supports an element essential to the nonmovant's

9    claim.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once the movant has met this burden, the

10    nonmoving party then must show that there is in fact a genuine issue for trial.  *Anderson*, 477 U.S. at

11    250.

12    **B.**     **APPLICABLE LAW**

13       **1.**     **CISG**

14       The parties did not include choice-of-law clauses as terms to the contracts at issue here.  Plaintiff

15    alleges that the United Nations Convention on Contracts for the International Sale of Goods ("CISG"),

16    15 U.S.C. Appx., applies to the instant dispute.  By its own terms, the CISG

17       applies to contracts of sale of goods between parties whose places of business are in
         different states:

18           (a)   When the States are Contracting States; or
          (b)   When the rules of private international law lead to the application of the law of a

19       Contracting State.

20    C.I.S.G., art. 1(1).

21       Here, Plaintiff is a British Virgin Islands corporation, while both Defendants are Washington

22    corporations.  The United States ratified the CISG in 1986.  Public Notice 1004, *U.S. Ratification of*

23    *1980 United Nations Convention on Contracts for the International Sale of Goods: Official English*

24    *Text*, *reprinted in* 15 U.S.C.A. Appx. (West).  However, neither the British Virgin Islands nor the United

25    Kingdom are signatories to the CISG.  Thus, only one side of the contracts at issue here and only one

26    ORDER – 3

1    side of this litigation involves parties of signatory States—Defendants Maher and PLIB.  Because *all*

2    contracting parties in this dispute are not businesses in States that are parties to the Convention, Article

3    1(1)(a) cannot provide a basis for application of the CISG.

4          Plaintiff argues that the fact that not all parties are from signatory States is irrelevant, invoking

5    Article 1(1)(b).  (Pl.'s Opp'n 12–13.)  Plaintiff asserts that application of private international law would

6    lead to the application of Canadian, United States, or Russian law, and because all three of *these* are

7    Contracting States, *see* C.I.S.G., 15 U.S.C. Appx. (Parties to the Convention), the CISG applies

8    *regardless* of Plaintiff's status as a corporation of the British Virgin Islands—a Non-Contracting State.

9    The Court disagrees.

10         When the United States ratified the CISG, it invoked the option found in Article 95 of the

11   Convention, which provides:  "Any State may declare at the time of the deposit of its instrument of

12   ratification, acceptance, approval or accession that it will not be bound by subparagraph (1)(b) of article 1

13   of this Convention."  C.I.S.G., art. 95.  The United States did exactly this, thus directly precluding the

14   reasoning Plaintiff attempts to apply.  As a matter of law, Plaintiff cannot circumvent the requirement of

15   Article 1(1)(a) by relying on Article 1(1)(b).  Instead, "the *only* circumstance in which the CISG could

16   apply is if all the parties to the contract were from Contracting States."  *Impuls I.D. Internacional, S.L. v.*

17   *Psion-Teklogix Inc.*, 234 F. Supp. 2d 1267, 1272 (S.D. Fla. 2002) (emphasis added); *see also Chateau*

18   *Des Charmes Wines Ltd. v. Sabate USA Inc.*, 328 F.3d 528, 530 (9th Cir. 2003) (stating the precondition

19   that GISG applies "'when the States are Contracting States'").  Because not all parties are from countries

20   that signed the CISG, the CISG cannot apply to this dispute, even if a traditional choice-of-law analysis

21   leads to the application of the law of the United States (or one of its states) or any other signatory State.

22   Accordingly, some body of law other than the CISG will govern this dispute.

23   //

24   //

25   //

26   ORDER – 4

2.    **Jurisdiction**

Because the CISG does not govern the instant suit, the contract disputes at issue here do not involve federal questions.[1]  Rather, this is a diversity case, involving a civil action between citizens of a State (Washington) and citizens or subjects of a foreign state (British Virgin Islands).  28 U.S.C. § 1332(a)(2).

3.    **Choice of Law**

Having determined that the CISG does not apply, the Court must determine which body of substantive law governs this diversity case.  No party specifically argues for the application of Washington law, Canadian law, Russian law, or British Virgin Islands law.  However, Defendants cite some Washington contract law in their briefing on summary judgment.  Plaintiff does not cite anything but the CISG and general American legal reference materials.  Thus, while Defendants appear to seek to have Washington law applied, Plaintiff raises the possibility that Canadian, Russian, or, less likely, British Virgin Islands law applies as part of its discussion of the CISG.  The Court therefore turns to the issue of these potentially competing bodies of contract law.

In diversity cases, federal district courts must apply the choice-of-law rules of the state where the federal court sits.  *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941).  Washington courts apply the choice-of-law analysis set out in the *Restatement (Second) of Conflict of Laws*.  *Fluke Corp. v. Hartford Accident & Indem. Co.*, 34 P.3d 809, 815 (Wash. 2001).  Accordingly, Washington courts will not engage in a conflicts analysis unless a true conflict exists.  *Burnside v. Simpson Paper Co.*, 864 P.2d 937, 940–41 (Wash. 1994).  No *specific* rules of law of any foreign jurisdiction are at issue on the instant motion, and no party seeks to have any specific rules applied as an alternative to Washington contract principles.  Because the answer to the threshold question—whether a true conflict exists—precludes a full

---

[1]  The CISG is "valid and binding federal law."  *Chateau Des Charmes*, 328 F.2d at 530. Accordingly, where the CISG applies, a United States District Court has federal question jurisdiction. *See Inpuls*, 234 F. Supp. 2d at 1270–71.

ORDER – 5

1   conflicts analysis in this case, the Court will not apply the *Restatement* conflicts test.[2]  Nevertheless, the

2   Court must apply some body of law to the instant motion.  The options include Washington law and the

3   contract law of the foreign jurisdictions listed *supra*.  For the following reasons, the Court chooses to

4   apply Washington contract law to this dispute.

5        The Court first notes that a party seeking to rely on foreign law in federal court "shall give notice

6   by pleadings or other reasonable written notice."  FED. R. CIV. P. 44.1.  Ninth Circuit law applying

7   Rule 44.1 is that where no specific foreign law is asserted, the Court is under no obligation to apply a

8   general body of foreign law to construe a contract.  *Commercial Ins. Co. of Newark, New Jersey v.*

9   *Pacific-Peru Constr. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977).  In *Pacific-Peru*, the Ninth Circuit

10  approved of a district court's application of the law of the forum, adopting the *Restatement*'s principle

11  that where "'both parties have failed to prove the foreign law, the forum may say that the parties have

12  acquiesced in the application of the local law of the forum.'"  558 F.2d at 952 (quoting RESTATEMENT

13  (SECOND) OF CONFLICTS OF LAWS § 136, cmt. h (1971)).  Here, Defendants' use of Washington law is a

14  clear acquiescence by application, and Plaintiff's lack of opposition to Defendants' citations may be

15  construed as the same.  Accordingly, as in *Pacific-Peru*, this Court finds that the parties have acquiesced

16  in the application of Washington law to their dispute, because both sides have either relied on or tacitly

17  approved of reliance on Washington law.

18        Applying Washington rules, the result is the same.  Washington courts have a rule analogous to

19  Federal Rule of Civil Procedure 44.1.  Civil Rules Wash. Superior Court CR 9(k)(2).  In Washington

20  courts, the burden is on a party seeking to apply foreign law to a dispute.  *British Columbia Ministry of*

21  *Health v. Homewood*, 970 P.2d 381, 384 (Wash. App. 1999).  Without "sufficient proof to establish with

22  reasonable certainty the substance of the foreign principles of law," a court should "apply the law of the

23  forum."  *Id.* (internal quotation omitted).  Because this Court must apply the choice-of-law rules of its

24

25        [2]  *But see infra* note 3 and accompanying text.

26  ORDER – 6

1   forum state, these Washington choice-of law rules govern.  Accordingly, Washington law should apply to

2   this dispute because Washington is the forum state and neither party has affirmatively asserted specific

3   rules of law from any foreign country that should be applied in lieu of Washington law.

4          Having determined that Washington contract law governs this dispute generally, the Court further

5   notes that where a specific conflict *does* exist between Washington law and the law of another

6   jurisdiction, Washington courts decide which law applies "by determining which jurisdiction has the 'most

7   significant relationship' to a given issue." *Burnside*, 864 P.2d at 940–41.  This is the test set forth in the

8   *Restatement (Second) of Conflict of Laws*. *Southwell v. Widing Transp., Inc.*, 676 P.2d 477, 479–80

9   (Wash. 1984); *Barr*, 635 P.2d at 443.  "Since 1967, Washington courts have adhered to and applied the

10  most significant relationship test[3] to contract choice of law issues." *Mulcahy v. Farmers Ins. Co. of*

11  _____

12       [3]  The *Restatement* sets forth the "most significant relationship" standard as follows:

13       (1) The rights and liabilities of the parties with respect to an issue in contract are determined by the local
         law of the state which, with respect to that issue, has the most significant relationship to the transaction
14       and the parties under the principles stated in § 6.
         (2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into
15       account in applying the principles of § 6 to determine the law applicable to an issue include:
         (a) the place of contracting,
16       (b) the place of negotiation of the contract,
         (c) the place of performance,
17       (d) the location of the subject matter of the contract, and
         (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.
18       These contacts are to be evaluated according to their relative importance with respect to the particular
         issue.

19  RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 188 (1971).  The principles of § 6 to be applied
20  include:

21       (1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice
         of law.
22       (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
         (a) the needs of the interstate and international systems,
         (b) the relevant policies of the forum,
23       (c) the relevant policies of other interested states and the relative interests of those states in the
         determination of the particular issue,
24       (d) the protection of justified expectations,
         (e) the basic policies underlying the particular field of law,
         (f) certainty, predictability and uniformity of result, and
25       (g) ease in the determination and application of the law to be applied.

26  ORDER – 7

*Wash.*, 95 P.3d 313, 317 (Wash. 2004).  While there is no need to apply the test here, as noted *supra*, the Court finds that its application could reasonably result in a finding that Washington has the most significant relationship to this dispute in any event.  Such a finding would provide further support for application of Washington law to this dispute.

## C.   THE CONTRACTS

Plaintiff alleges that Maher produced and delivered nonconforming[4] goods and that PLIB failed to properly inspect these goods to identify their defects.  The agreement between Maher and Plaintiff is a contract for the sale of goods, while the agreement between PLIB and Plaintiff is one for services.  This distinction is relevant with respect to the applicable law.  The Uniform Commercial Code applies to sales of goods, while the common law of contracts governs services agreements.  *See Tacoma Athletic Club, Inc. v. Indoor Comfort Systems, Inc.*, 902 P.2d 175, 177–80 (Wash. App. 1995) (discussing applicability of Washington's UCC in "mixed" contracts for the sale of goods and services).  The Court begins with the Maher–Prime Start contract.

Defendant Maher claims that the *only* enforceable terms are found in the operative written invoice, described *infra*, and that any implied or verbal terms regarding stain application quality or the final appearance of the goods are either nonexistent or unenforceable.  Plaintiff, on the other hand, seeks to enforce such appearance-related terms in this lawsuit.

---

*Id.* § 6.  Application of these sections involves a two-step analysis.  *Southwell*, 676 P.2d at 480.  The first is to evaluate the contacts with each interested jurisdiction "according to their relative importance with respect to the particular issue."  *Id.*  The second step "involves an evaluation of the interests and public policies of potentially concerned jurisdictions," the extent of which "should be determined on the basis, among other things, of the purpose sought to be achieved by their relevant local law rules and the particular issue involved."  *Id.*  The "ultimate outcome, in any given case, depends upon the underlying facts of that case."  *Id.*

[4]  "Goods or conduct including any part of a performance are 'conforming' or conform to the contract when they are in accordance with the obligations under the contract."  WASH. REV. CODE § 62A.2-106(2).

ORDER – 8

In contracts for the sale of goods, the statute of frauds is a concern.  Under Washington law, a contract for the sale of goods over $500 is enforceable only if there is "some writing sufficient to indicate that a contract for sale has been made."  WASH. REV. CODE § 62A.2-201.  Quantity is the only term that must be in writing; other terms may be supplied either in writing or orally.  *See id.*  The Uniform Commercial Code's Official Comments reinforce that not all material terms must be written and that stated material terms "need not be precisely stated."  *Id.* UCC cmt. 1.  Thus, as a general matter, non-quantity terms may be imprecise and unwritten, yet enforceable.

The statute of frauds poses no problem here.  Quantity is specified in writing and there is no dispute that Maher and Plaintiff had a contract.  Rather, the issues here involve the Maher–Prime Start contract's *specific terms* and the enforceability of certain expectations that might be proven by parol evidence.

A contract for the sale of goods "may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract."  *Id.* § 62A.2-204(1).  Moreover, the existence of "open" terms is not fatal.  The critical question is whether "there is a reasonably certain basis for giving an appropriate remedy."  *Id.* § 62A.2-204(3).

Where terms are *not* stated in the parties' writing, parol evidence of "consistent additional terms" may be considered "unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."  *Id.* § 62A.2-202.  Thus, additional terms that do not contradict the writing may be part of the contract, creating a partly-written and partly-oral contract for sale.  *Lopez v. Reynoso*, 118 P.3d 398, 401–03 (Wash. App. 2005) (finding consistent additional oral terms permissible even where the parties' writing contained an "integration clause").  Notably, here, there is no "integration clause" in the parties' writing, so the principle found in *Lopez* has even greater applicability.  Moreover, given the negotiations and discussions between the parties, the Court can find no reason to hold that Maher and Plaintiff intended the whole of their agreement to be in the written single-page invoices described *infra*.  Furthermore, "[w]hether the parties intended the written contract to

ORDER – 9

1   be the sole agreement is a question of fact." *Morgan v. Stokely-Van Camp, Inc.*, 663 P.2d 1384, 1389

2   (Wash. App. 1983). Accordingly, the Court will look beyond the written invoices and consider whether

3   consistent additional terms may be part of the Maher–Prime Start agreement.

4        If unwritten appearance-related terms do exist as part of the Maher–Prime Start contract, their

5   content and the extent to which they are enforceable will be the next question. Particularly relevant to

6   this motion is the rule that where a contract is not fully integrated in a writing (as is likely here), the

7   *content* of additional terms is almost invariably an issue of fact. *See Hankins v. American Pac. Sales

8   Corp.*, 499 P.2d 214, 215 (Wash. App. 1972). Thus, the question of integration, as well as the inquiry

9   into the content of unwritten terms are factual questions. The Court must consider whether Plaintiff has

10   raised genuine issues going to these factual determinations sufficient to defeat summary judgment.

11        Finally, not only may some terms be supplied orally or by subsequent correspondence of the

12   parties, there is no requirement that "modifications" of essential terms be in writing, as long as the

13   original contract satisfied the statute of frauds. *Costco Wholesale Corp. v. World Wide Licensing Corp.*,

14   898 P.2d 347, 350–51 (Wash. App. 1995) (applying Washington Revised Code section 62A.2-209 to

15   allow oral modification of *price* term). Assuming, without deciding, that the unwritten terms asserted

16   here would be "essential" if they are indeed part of the contract, oral modifications to such terms would

17   be permissible under the *Costco* rule. Accordingly, the entire negotiations process between the parties

18   will be relevant to determining both the existence of and the final form of any unwritten terms.

19        Because not all terms must be found in one place and this contract for the sale of goods may be

20   partly written and partly oral, the Court now turns to the available evidence of the actual and possible

21   terms of the Maher–Prime Start agreement. Such evidence is found in a collection of documents and

22   negotiations.

23        In June 2004, Plaintiff and Maher agreed that Plaintiff would purchase manufactured wood

24   products from Maher for use in Plaintiff's client's Russian construction project. One of the specifications

25   at that time was that fire retardant treatment would be applied to the cedar. In October 2004, Plaintiff

26   ORDER – 10

1    added a specification for staining as well, choosing a custom stain of "ONE COAT SIKKENS CLEAR

2    CETOL-1, #077," as reflected in an invoice for the purchase.  (Defs.' Mot., Dahl Decl. 33 (Maher Pro

3    Forma Invoice No. 34187, dated October 8, 2004) [hereinafter October Invoice].)  However, after this

4    stain's fumes allegedly made the appliers sick, Plaintiff chose a new stain color.  A superseding invoice

5    reflects this change.  The new custom stain requirement is described as "TWO COATS GE[N]ERAL

6    PAINT 18-151 WOODCRAFT S/T STAIN-NEUTRAL BASE TINTED PER CUSTOMER'S ORDER

7    DATED 11-25-04."  (*Id.*, Maher Decl. 9 (Maher Pro Forma Invoice No. 34187, dated December 14,

8    2004) [hereinafter December Invoice].)  The December Invoice is the most recent and therefore is the

9    operative one as to the Maher-Prime Start terms that it covers.

10          In addition to the stain-color specification, the December Invoice supplied terms regarding wood

11   grade and preparation.  Specifically, the invoice called for

12         WESTERN RED CEDAR #2 CLEAR & BETTER PER PARAGRAPH 401 and/or 409
           OF THE PLIB "R" LIST, EXCEPT THAT BACK MAY CONTAIN SMALL SOUND
13         IRREGULARITIES

14         KILNDRIED., 10/14% M.C SURFACED BEST SIDE AND BOTH EDGES , GROOVE
           AND MILLED PER CUSTOMER PATTERN, FIRE RETARDANT TREATED PER
15         ASTM-E84.  CUSTOM STAINED TWO COATS GE[N]ERAL PAINT 18-151
           WOODCRAFT S/T STAIN-NEUTRAL BASE TINTED PER CUSTOMER'S ORDER
16         DATED 11-25-04.

17   *Id.*  The references in this invoice to Paragraphs 401 and 409 are critical to this dispute.  These are

18   provisions of Defendant PLIB's "Export R List Rules," apparently a source of industry standards.  By

19   including references to Rules 401 and 409[5] in the December Invoice, the parties agreed that the contract

20   incorporated these rules.

21   //

22

23   ─────────────────────

24          [5]  Rules 401 and 409 provide quality specifications for "No. 2 Clear and Better" Western Red
     Cedar regarding sawing variations, knots, irregularities, checks, sap stain, skips, and grain.  (*See* Defs.'
25   Mot., Fantozzi Decl. 18–20 (excerpt from the "Western Red Cedar" section (pages 109–110 and
     118–119) of PLIB's "Export R List Rules").)

26   ORDER – 11

1    Another PLIB rule that is *not* explicitly listed in the December Invoice is significant to the instant

2 motion. Specifically, Maher and Plaintiff disagree about whether PLIB "Rule 500" is part of the Maher-

3 Prime Start contract, and if so, whether and to what extent it applies to the instant dispute. However,

4 Defendants agree that Rule 500 cannot apply to the issues of stain application or final appearance of the

5 goods. (Defs.' Reply 5.) Rule 500 provides a "reinspection" procedure in cases of complaints about

6 "grade, tally, size or moisture content." (*See* Defs.' Mot., Fantozzi Decl. 21–24 (text of the

7 "Reinspection Provisions" section (pages 131–136) of PLIB's "Export R List Rules").)

8    Significantly, PLIB's "Western Red Cedar" rules—which include Rules 401 and 409—begin with

9 a "note" that "Shipping Provisions, General Grading Provisions, Definitions, and Seasoning Provisions,

10 pages 25 to 44, *and Para. 500, page 131, are a part of and supplemental to these Rules*." (Defs.' Mot.,

11 Fantozzi Decl. 18 (first page of the "Western Red Cedar" section (page 109) of PLIB's "Export R List

12 Rules") (emphasis added).) Nevertheless, Plaintiff asserts that it did not have a complete set of the

13 Export R List Rules when it agreed to incorporate the Rule 401 and Rule 409 standards. Rather, Plaintiff

14 suggests that it only had copies of those *specific* rules and did not have any knowledge of the

15 incorporation "note" to the "Western Red Cedar" section of the rules referring to Rule 500. (Pl.'s

16 Opp'n, Matijevic Decl. ¶¶ 6–7.) Indeed, it is only in a February 2005 e-mail discussion between Mr.

17 Matijevic and Mr. Maher about the quality of the shipped goods and Plaintiff's dissatisfaction that the

18 first apparent reference to Rule 500 is made in written correspondence between the parties. (Defs.' Mot.,

19 Maher Decl. 23–32 (e-mail from Terry Maher (for Maher) to Milan Matijevic (for Plaintiff), dated

20 February 13, 2005) ("You may wish to read very carefully the provisions of Para. 500 for the resolution

21 of any form of dispute, partially para 500.h.") (including as an attachment copies of Rules 401, 409, and

22 500).) Plaintiff claims that this is the first time it was aware that Rule 500 was supposedly part of the

23 Maher–Prime Start contract.

24    While it may be unclear whether Rule 500 applies to any part of the instant dispute, it clearly

25 cannot apply to stain application or final appearance grievances. Further, as to areas that Rule 500 could

26 ORDER – 12

1    cover, Plaintiff has raised a genuine issue of fact as to whether Rule 500 was actually incorporated into

2    the contract.  Accordingly, the Court cannot find as a matter of law that Plaintiff failed to follow Rule

3    500's reinspection procedures as to any claims it has raised regarding nonconformance to grade, tally,

4    size or moisture content.

5           Another relevant reference in the December Invoice is to staining "per customer's order dated 11-

6    25-04."  This appears, however, to be an error—the date should be December 2, 2004.  (Defs.' Reply 5

7    n.9; Defs.' Mot., Dahl Decl. 29 (Minutes of Meeting, dated December 2, 2004 by hand—where printed

8    date of November 29, 2004 is crossed out—and signed by Mr. Matijevic, Mr. Maher, and other

9    representatives of Pacific Custom Stain, the project in Russia, and Plaintiff) [hereinafter December Stain

10   Color Agreement]; Pl.'s Opp'n, Matijevic Decl. ¶ 16 (referring to a December 2, 2004 meeting to

11   determine the "final" "color selection and finish material").)  The events of the parties' December 2, 2004

12   meeting clearly supplement and are incorporated into the December Invoice.  The stain formula approved

13   at that time was "General Paints" "Color No 'F' consisting of 1st coat of 'F-2', second coat of 'four parts

14   clear plus one part Gray.'"  (December Stain Color Agreement.)  Beyond the specification of the

15   particular stain to be used, however, there is intense dispute as to whether the December 2, 2004 meeting

16   supplied contract terms regarding the *application* of the stain and the *final appearance* of the goods.

17          Additional terms to the Maher–Prime Start contract may have been verbally supplied at other

18   times as well.  Evidence of one such verbal agreement, for instance, appears in an e-mail from Terry

19   Maher, President of Defendant Maher, written to PLIB representative Jeff Fantozzi, indicating that there

20   was a verbal agreement between Plaintiff and Maher that Maher would increase the quality of the wood

21   beyond the standards of PLIB Rule 409, such that there would be "2/3 of the edge *adjacent to the face*

22   [of the board] that is not damaged."  (Defs.' Mot., Fantozzi Decl. 7–8 (e-mails between Terry Maher (for

23   Maher) and Jeff Fantozzi (for PLIB), dated December 20, 2004).)  Further evidence that the written

24

25

26   ORDER – 13

documents do not supply all of the terms is found in an e-mail from Terry Maher to Milan Matijevic,[6]

stating that "we have a contract to produce 'Western [R]ed Cedar No. 2 Clear and Better per Proforma

Invoice #34187 dated 14 Dec, 2004' and that is what we have done with numerous modification[s]

requested by yourself after the contract was negotiated." (Defs.' Mot., Maher Decl. 22 (e-mails between

Terry Maher (for Maher) and Milan Matijevic (for Plaintiff), dated January 16, 2005).)  This statement

suggests that oral modifications to the contract existed, supplying additional terms that were not

originally part of the agreement.  As the Court has noted, both the existence and scope of such terms are

disputed.

Plaintiff claims that the parties made oral terms and modifications thereof involving the final

appearance of the goods.  It is clear from the record that, before the stain color selection was finalized in

December 2004, discussions regarding color certifications and product appearance were ongoing.  The

extent to which these discussions create enforceable contractual obligations is central to the instant

motion.  Several discussions provide evidence of the parties' intent regarding the product color and

appearance.  For instance, on July 10, 2004, long before even the October Invoice was created, Mr.

Maher addressed an apparent request by Plaintiff that there should be a "'custom staining certificate that

finish will be effective'" before Maher could receive payment for the goods, by stating that "no such

certification exists" and instead suggesting a "certificate confirming that [the original stain selection] has

been applied per the manufacturer's instructions." (Defs.' Mot., Dahl Decl. 34–35 (e-mail from Terry

Maher (for Maher) to Milan Matijevic (for Plaintiff), dated July 10, 2004).)  The record does not reflect a

direct response to this suggestion.  However, there is evidence that the product-appearance discussion

continued into at least October (at meetings between the parties) and November 2004 (in e-mail

---

[6] Mr. Matijevic is an architect employed by P&F Italia S.R.L., a Purchasing Director involved in the Russian building project at issue here.  Plaintiff Prime Start was used by P&F Italia S.R.L. to purchase materials for the project, and at all times relevant to this litigation, Mr. Matijevic was authorized to represent Plaintiff in negotiations and contracting with Defendants Maher and PLIB on matters relevant to this litigation.  (Pl.'s Opp'n, Matijevic Decl. ¶ 1.)

ORDER – 14

1  correspondence).  Evidence of this ongoing discussion follows.

2       In October 2004, the parties attended meetings in Canada.  The Minutes from these meetings

3  clearly indicate Plaintiff's concern with the final product appearance.  First, Plaintiff changed color

4  specifications several times throughout the course of negotiations because of client directives.  (Pl.'s

5  Opp'n, Matijevic Decl. Ex. F (Minutes of parties' meeting, dated October 25, 2004 and recorded by Mr.

6  Maher) [hereinafter October 25, 2004 Meeting Minutes].)  In addition to stain color, the October 25,

7  2004 meeting addressed Plaintiff's complaint about "knife marks" on the face of the wood siding.  (*Id.*)

8  Apparently, such marks were exaggerated by application of stain to the wood, resulting in an

9  objectionable appearance.  Notably, Mr. Maher's meeting minutes state that "[a]lthough it appears the

10 quality of the dressing on the product meets the letter of Para 409 of the 'R' List, it does not meet the

11 requirements of Prime Start due to the appearance of knife marks on the face of the product.  The

12 application of the Sikkens finish is exaggerating the marks to the point the[y] are understandably

13 objectionable."  (*Id.*)  This statement by Defendant Maher's representative indicates that, early on, the

14 parties contemplated specifications for the product appearance *in addition* to those terms outlined in the

15 October and December Invoices—which merely specified incorporation of Rules 401 and 409, specified

16 the brand of stain to be used, and eventually incorporated the terms of the December Stain Color

17 Agreement.

18      Buttressing the relevance of Plaintiff's concerns about Maher's production of visually appealing

19 goods is a discussion that took place at the October 25, 2004 meeting regarding Plaintiff's desire for

20 "additional inspection" of finished product (which inspections are discussed in more detail *infra*).  In

21 commenting on such inspections, Mr. Maher noted his "observation" that Maher "has stepped outside its

22 area of expertise in this transaction in scheduling fire retardant work and custom finishing.  This cannot

23 be allowed to happen again as [Maher] has absolutely no expertise in these areas and can neither properly

24 supervise these activities nor guarantee results."  (*Id.*)  Again, while suggesting that Maher was not

25 thrilled about Plaintiff's demands regarding "results," some level of obligation as to appearance is implicit

26 ORDER – 15

1    in this remark.  Indeed, a reasonable factfinder could conclude that Maher planned to form future

2    contracts differently than the instant one precisely because Maher was not comfortable with the

3    obligations it undertook regarding product appearance.

4           October 26, 2004 meeting notes again suggest Maher's acknowledgment of an obligation

5    regarding product appearance.  Specifically, Mr. Maher noted that Maher's Quality Control Manager

6    would "oversee the mixing of all stains and . . . compare the finished product to the samples."  (Pl.'s

7    Opp'n, Matijevic Decl. Ex. H (Minutes of parties' meeting, dated October 26, 2004 and recorded by Mr.

8    Maher) [hereinafter October 26, 2004 Meeting Minutes].)

9           November 2004 e-mail correspondence between Terry Maher and Milan Matijevic further

10   demonstrates that Mr. Matijevic continued to bring up the issue of appearance expectations.  At that

11   time, Mr. Maher responded that he could not certify that fire retardant treatment would not change the

12   color of the wood and that there would be no guarantee from the stain producer regarding "translucent

13   products characteristics for a specified period of time."  (Pl.'s Opp'n, Matijevic Decl. Ex. G (e-mails

14   between Terry Maher (for Maher) and Milan Matijevic (for Plaintiff), dated November 30, 2004 and

15   December 1, 2004).)  Mr. Maher also stated that "[w]hen [Matijevic] finally realized the rule (para 409)

16   admitted defects not allowed under [Matijevic's] contract with [his] client, [he] became understandably

17   agitated."  (*Id.*)

18          While not conclusive as to the question of the existence of oral terms regarding stain application

19   and appearance of the goods, the foregoing evidence is sufficient to prevent summary judgment.  Plaintiff

20   has raised a genuine issue of material fact as to whether there were terms to its contract with Maher in

21   addition to those found in the December Invoice, whether such terms are enforceable, and if so, to what

22   extent.  The contours of the parties' unwritten or partially-written agreement present issues of fact for

23   trial.  This conclusion is further supported by the following discussion of Plaintiff's contract with

24   Defendant PLIB, evidence of which goes to Plaintiff's claim against Maher as well, due to the

25   interrelatedness of the two contracts.

26   ORDER – 16

1    While reference is made in the Maher-Prime Start contract to PLIB quality standards, PLIB's

2  actual obligations under a separate contract with Plaintiff are not mentioned anywhere in Plaintiff's

3  contract with Maher.  Instead, these obligations to provide inspection services are the subject of a

4  separate set of documents and negotiations.

5    First, for Maher to receive payment for the goods, Plaintiff arranged for a letter of credit.  The

6  Documentary Credit in this matter originally required production of a "PLIB Certificate that the goods

7  correspond to the description mentioned in the proforma invoice No[.] 34187 dated October 8th, 2004."

8  (Pl.'s Opp'n, Matijevic Decl. Ex. A (Documentary Credit, dated October 12, 2004) [hereinafter

9  Documentary Credit].)[7]  Due to the change in stain color specification in December 2004, the

10  Documentary Credit was later amended to reflect that the goods would conform to the "Proforma

11  Invoice No 34187 dated December 14, 2004," rather than conforming to the October Invoice.  (*Id.* Ex. C

12  (Amendment to a Documentary Credit, dated December 16, 2004) [hereinafter Amended Documentary

13  Credit].)

14    As to the inspection services that PLIB was to provide, several e-mails and discussions were

15  exchanged by the parties.  Specifically, Plaintiff's representative Mr. Matijevic requested that PLIB

16  provide inspection of the siding, noting that he wanted the inspection to include *grade, quantity, size, and*

17  *humidity*.  (Defs.' Mot., Fantozzi Decl. 4–6 (e-mails between Milan Matijevic (for Plaintiff) and Jeff

18  Fantozzi (for PLIB), dated September 30, 2004 through October 7, 2004).)  The parties' October 25,

19  2004 meeting also involved discussion of additional inspections requested by Plaintiff to be done by an

20  "'independent third party' . . . for such operations a[s] *fire retardant treating, finish application,*

21  *packaging*, etc."  (October 25, 2004 Meeting Minutes (emphasis added).)  An e-mail from Plaintiff's

22

23  ─────────────────

24    [7]  Other relevant documents required before payment included a "Fire retardant treatment
certificate," a "Custom staining certificate that stain application was done in accordance with the
Manufacturer's recommendation," and the "Paint manufacturer's recommendation for maintenance of the

25  finish."  (Documentary Credit.)

26  ORDER – 17

1    representative Mr. Matijevic indicates that Plaintiff had an expectation that there would be an

2    independent inspection for quality control of the product ordered from Maher.  According to Mr.

3    Matijevic, the inspector was *not* to be certifying "grading," but rather was to be certifying that "the goods

4    are in accordance with the quality standards set" and that "the report including photos should be an

5    integral part of inspection."  (Defs.' Mot., Fantozzi Decl. 12–15 (e-mails between Milan Matijevic (for

6    Plaintiff) and Jeff Fantozzi (for PLIB), dated December 20, 2004).)  These e-mails designated Steve

7    McAdam as the inspector.  PLIB's response to Plaintiff indicated that PLIB was aware of the verbal

8    amendment to the Rule 409 requirements (requiring increased quality) apparently negotiated between

9    Maher and Plaintiff and described *supra*.  In reply, Mr. Matijevic said that he believed that the parties

10   understood each other and added a few more details about knife, feeder, and carton marks on the boards.

11   (*Id.*)  *Mr. Maher's* minutes from the October 25, 2004 meeting confirm that "inspections outside of those

12   mandated by the [letter of credit] are to be contracted by [Plaintiff] directly with PLIB."  (October 25,

13   2004 Meeting Minutes.)

14           The foregoing suggests that inspections for stain application quality and final appearance were

15   part of the parties' expectations, even if they were outside the realm where Maher was comfortable

16   participating.  Accordingly, in addition to speaking to PLIB's obligations, these discussions provide

17   further evidence that there may have been enforceable unwritten terms in the Maher–Prime Start contract

18   regarding appearance and stain application.  As to Plaintiff's contract claim against PLIB, the issue is

19   whether PLIB adequately performed its obligations to inspect the goods under the terms of the parties'

20   agreement.  The Court now turns to further evidence of the PLIB–Prime Start agreement terms.

21           On December 17 and 20, 2004, Steve McAdam, along with Norm Ha, performed the requested

22   "final grade and condition inspection" of the materials that Plaintiff ordered from Maher.  Mr. McAdam's

23   report indicated that Mr. Matijevic had "verbally supplied" the following quality requirements that were

24   taken into consideration during the inspection:

25

26   ORDER – 18

- No significant or readily visible handling damage allowed
- No planer knife marks or end snipes permitted
- Pieces having defects in excess of the above requirements were marked to indicate trim required to conform to Para 409 *and appearance standards*
- Pieces with excessive damage, or below grade, were also end marked as rejects but were included in packages.

(Pl.'s Opp'n, Matijevic Decl., Ex. J (Memorandum from Steve McAdam to Jeff Fantozzi (for PLIB), dated December 27, 2004) at 1 (emphasis added) [hereinafter McAdam Report].)  Mr. McAdam's report goes on to say that the "application and colour of the stain was not visually appealing to me.  It did not appear to be an issue with Mr. Matijevic so it was not taken into consideration." (*Id.*)  Defendants emphasize this statement, arguing that Mr. McAdam's comment was gratuitous, was not reflective of his obligation under the PLIB–Prime Start contract to inspect, and does not shed light on Maher's obligations.  However, the reference to inspecting for "appearance standards" as one of the inspection "requirements" suggests the opposite.

Furthermore, even if Defendants' argument about the above-quoted portions of Mr. McAdam's report might seem plausible when those statements are considered in isolation, more context would suggest otherwise.  Notably, *page two* of Mr. McAdam's report adds further detail on the extremely relevant issue of the appearance and finishing of the goods, yet Defendants inexplicably chose to *exclude the second page of this two-page report* from their exhibits on the instant motion, instead submitting *just* the first page.  (*See* Defs.' Mot., Fantozzi Decl. 17 (page 1 of the 2-page McAdam Report).)  Only in Plaintiff's set of opposition materials does the conclusion of Mr. McAdam's comments appear.  Specifically, the second page of the report concludes,

Regardless, I believe that when the end users see it they will want to apply additional finish to improve the appearance.

Unfortunately, I am also certain that the pattern used with the very sharp acute-angled edge on one side will prove to be anything but durable in an exposed exterior application.  A short period outdoors will result in damage to this edge far in excess of what we were rejecting in our inspection.

Photographs taken by me were focused mainly on the colour variations encountered.  I could submit them but photos taken by the treatment plant staff may be of more interest to

ORDER – 19

1    Mr. Matijevic.

2  (McAdam Report 2.)  While the weight of this report is a question for the factfinder, the Court notes that

3  the report's conclusion—omitted by Defendants—further suggests that Defendants may have undertaken

4  more obligations than they acknowledge.

5    The results of Mr. McAdam's inspection notwithstanding, pre-shipment inspection certificates

6  supplied by PLIB on December 22, 2004, January 14, 2005, and January 21, 2005 indicate that PLIB

7  certified that the inspected goods were "in conformity" or "in accordance" with the "grade description in

8  Proforma Invoice #34187 dated 14 December, 2004," *as well as* conforming "to paragraph No. 409 of

9  the Export 'R' List Grading and Dressing Rules."  (Defs.' Mot., Maher Decl. 5–7 (PLIB Certificates of

10  Inspection).)  Three shipments of goods ultimately proceeded, in part due to PLIB's provision of these

11  certificates.  Relevant to the Maher–Prime Start contract, the PLIB-certificate wording suggests that the

12  requirements of the December Invoice were indeed separate and distinct from the Rule 409 requirements.

13  Moreover, if the December Invoice incorporated appearance standards, such requirements could bind not

14  only Maher, but also PLIB, if PLIB was aware of such standards.

15    The foregoing evidence sufficiently raises additional issues of material fact as to the scope of

16  PLIB's inspections, including whether PLIB met its contractual obligations if such obligations included

17  appearance-related inspections.  The Court finds that there is sufficient evidence to prevent summary

18  judgment as to Defendant PLIB, because a reasonable factfinder could conclude that PLIB *was* inspecting

19  for stain application quality and appearance.

20    The goods were shipped in three installments between December 2004 and February 2005.  Mr.

21  Matijevic attended Mr. McAdam's inspection on December 17, 2004.  Upon receipt of Mr. McAdam's

22  report, Mr. Matijevic e-mailed Mr. Maher, on January 2, 2005, requesting that further shipments be

23  delayed until already-shipped material arrived at the Russian job site.  (Defs.' Mot., Maher Decl. 33 (e-

24  mail from Milan Matijevic (for Plaintiff) to Terry Maher (for Maher), dated January 2, 2005).)

25

26  ORDER – 20

1    Subsequent events[8] raise issues of possible breaches by Plaintiff if Maher and PLIB had not already

2    breached.  Because the Court has found material issues of fact as to the *terms* of both contracts,

3    addressing these additional factual issues in detail is premature.

4        Finally, the Court notes that, in addition to the disputed contract terms discussed *supra*, there also

5    may be warranty breaches involved in the Maher–Prime Start agreement.  Warranties may be express or

6    implied.  Express warranties may arise from, among other things, (1) "any description of the goods that is

7    made part of the bargain," which creates an "express warranty that the goods will conform to that

8    description," or (2) a "sample or model which is made part of the basis of the bargain," which creates an

9    "express warranty that the whole of the goods shall conform to the sample or model."  WASH. REV. CODE

10   § 62A.2-313(1).  The words "warrant" or "guarantee" are not required, nor must there be a specific

11   intention to make a warranty for one to be created.  *Id.* § 62A.2-313(2).  *See Valentine v. Neb. Bridge*

12   *Supply & Lumber Co.*, 173 P. 746, 746–47 (Wash. 1918) (holding contract provision to be a warranty).

13   Moreover, an express warranty may be omitted from the writing without creating a statute-of-frauds

14   problem, because express warranties may be unwritten.  *See* WASH. REV. CODE § 62A.2-201, UCC cmt.

15   1 ("price, time and place of payment or delivery, the general quality of the goods, or any particular

16   warranties may all be omitted").  The same evidence may be alternatively relevant to contract terms *or*

17   warranties.  *See Butcher v. Garrett–Enumclaw Co.*, 581 P.2d 1352, 1359 (Wash. App. 1978) (noting that

18   the same testimony may go to contract terms and warranties and representations when the parties'

19

20       [8] For instance, dissatisfied with the product shipped, Plaintiff requested that a Maher
     representative visit Moscow to inspect the goods.  Maher refused.  (Defs.' Decl., Maher Decl. 21–22 (e-
21   mails between Terry Maher (for Maher) and Milan Matijevic (for Plaintiff), dated January 16 and 22,
     2005).)  Plaintiff then attempted a second amendment to the Documentary Credit on January 24, 2005 to
22   replace the PLIB certification requirement with a requirement that there be a certificate "signed by Arch.
     Mr. Milan Matijevic confirming that the goods correspond to the description in the Proforma invoice no
23   34187 dated 14th December 2004."  (Defs.' Mot., Maher Decl. 38 (Amendment to a Documentary
     Credit, dated January 24, 2005) [hereinafter Second Amended Documentary Credit].)  Apparently,
24   however, Maher, as the beneficiary, did not accept this second amendment.  (Defs.' Mot., Dahl Decl.
     13–14 ("Memo" apparently written by a representative of Plaintiff, undated).)  Ultimately, Plaintiff
25   remanufactured the goods to obtain a satisfactory finish and appearance.

26   ORDER – 21

1 writing is not fully integrated). Because express warranties may be unwritten, and because there are

2 disputed facts as to Maher–Prime Start contract terms that would speak to potential warranties as well,

3 the Court finds that material issues of fact remain as to the existence of any enforceable express

4 warranties.

5       In contrast to express warranties, implied warranties are "obligation[s] which the law imposes

6 without regard to any supposed agreement of the parties." *A.T. Fossum v. Timber Structures, Inc.*, 341

7 P.2d 157, 170 (Wash. 1959). For example, the implied warranty of "merchantability" requires, among

8 other things, that goods "pass without objection in the trade under the contract description" and are "run,

9 within the variations permitted by the agreement, of even kind, quality and quantity within each unit and

10 among all units involved." WASH. REV. CODE § 62A.2-314. The implied warranty of "fitness for a

11 particular purpose" governs cases where a buyer relies on a seller's "skill or judgment to select or furnish

12 suitable goods." *Id.* § 62A.2-315. Pre-UCC cases indicate that such warranties have long been part of

13 Washington law. *O.I. Hall v. Puget Sound Bridge and Dry Dock Co.*, 403 P.2d 41, 43–45 (Wash. 1965)

14 (discussing "sale by description" and "sale by sample"—UCC "fitness for a particular purpose"

15 precursors); *George E. Miller Lumber Co. v. Holden*, 273 P.2d 786, 791 (Wash. 1954) (applying the

16 "fitness for a particular purpose" code sections (WASH. REV. CODE §§ 63.04.150, 63.04.160) that were

17 superseded by Washington's adoption of the UCC (WASH. REV. CODE §§ 62A.2-314, 62A.2-315)); *see*

18 *also Oregon Lumber Co. v. Dwyer Overseas Timber Prods. Co.*, 571 P.2d 884, 888 (Or. 1977) (finding

19 "sale by sample" despite refusal to guarantee grade when buyer hand-selected acceptable goods from

20 mill). Whether such warranties exist is "a question of fact for the jury" where facts are disputed or where

21 different conclusions are reasonable. *O.I. Hall*, 403 P.2d at 44. As with unwritten contract terms, parol

22 evidence may be used to evaluate implied warranty claims. *A.T. Fossum*, 341 P.2d at 170. As with

23 express warranties, the law of implied warranties suggests that, on these facts, implied warranties may be

24 enforceable. The Court finds that there are material issues of fact here too that cannot be resolved on

25 summary judgment.

26 ORDER – 22

1    Because of the factual issues found *supra*, the Court does not need to address the parties'

2    arguments regarding Plaintiff's costs allegedly incurred due to Defendants' alleged breach.  Consideration

3    of such claims at this time is inappropriate due to the questions of breach yet to be resolved.

4    **D.    MOTION TO STRIKE**

5    Defendants object to and have moved to strike Plaintiff's Exhibits M and N and references thereto

6    in Mr. Matijevic's declaration.  (*See* Pl.'s Opp'n, Matijevic Decl. Exs. M, N.)  These exhibits are pages of

7    a private inspection report from a company hired by Plaintiff, photo attachments thereto, and a billing

8    invoice for the inspection.  The Court first notes that Defendants' objection is somewhat

9    incomprehensible, given that the very documents to which Defendants object as presented by Plaintiff

10   were first partially supplied to the Court by Defendants themselves in support of their own motion.

11   (*Compare* Defs.' Mot., Dahl Decl. 21–22, *with* Pl.'s Opp'n, Matijevic Decl. Ex. M at 1–2.)  More

12   importantly, Defendants supplied the 2-page written report, whereas Plaintiff's submittal merely provided

13   this exact report *plus* photo attachments thereto and a billing invoice for the inspection.  Plaintiff simply

14   completed the context of what Defendants had themselves included in their own exhibits.

15   The foregoing reasons are alone sufficient to deny Defendants' motion.  However, consideration

16   of this evidence was not necessary to the Court's rulings on summary judgment.  The objected-to

17   evidence speaks to whether the stain application and final appearance of the goods constituted breach.

18   Because the Court has found genuine issues of material fact going to whether there are contract terms or

19   warranties creating appearance-related obligations, as well as issues of fact as to whether particular

20   reinspection procedures were incorporated to govern other obligations (*i.e.*, such characteristics as Rule

21   500 covers), the Court cannot consider any evidence of *nonconformance* to such obligations by Maher at

22   this stage of the litigation.  Nonconformance on the basis of appearance (or the various other criteria

23   listed in the private inspection report) may or may not ultimately require consideration, depending on how

24   the factual issues described in this Order are resolved.  Similarly, evidence of any breach by PLIB cannot

25   be considered until PLIB's obligations are defined.  Accordingly, Defendants' Motion to Strike is

26   ORDER – 23

1    DENIED as MOOT because it prematurely addresses factual evidence not yet properly before the Court.

2    **III.    CONCLUSION**

3            For the reasons set forth in this Order, Defendants' motion for summary judgment and dismissal

4    of all claims against them is DENIED.

5            SO ORDERED this 17th day of July, 2006.

6

7                                                    John C. Coughenour
                                                     United States District Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26   ORDER – 24